Cite as 2022 Ark. App. 3

# ARKANSAS COURT OF APPEALS
DIVISION III
**No.** CV–21–11

|  |  |  |
|---|---|---|
| | | **Opinion Delivered** January 12, 2022 |
| KELLY MULLINS | | APPEAL FROM THE GARLAND |
| | APPELLANT | COUNTY CIRCUIT COURT |
| | | [NO. 26CV-18-523] |
| V. | | |
| | | HONORABLE MARCIA R. |
| | | HEARNSBERGER, JUDGE |
| JOEL HELGREN | | |
| | APPELLEE | AFFIRMED AS MODIFIED |

**BART F. VIRDEN, Judge**

Appellant Kelly Mullins appeals from the Garland County Circuit Court's order denying her complaint to quiet title. The trial court rejected her claim of adverse possession and boundary by acquiescence; found that the disputed land belongs to her neighbor, appellee Joel Helgren; and ruled that she failed to prove that Helgren committed any torts. Mullins argues that the trial court erred in concluding that she failed to prove boundary by acquiescence and that she failed to prove that Helgren committed trespass, conversion, and battery.[1] We initially dismissed this appeal for lack of a final order and failure to provide a

---

[1]Mullins's attorney cited and discussed six unpublished cases in direct violation of Arkansas Supreme Court Rule 5-2(c). Rule 5-2(c) provides that opinions of the Arkansas Supreme Court and Court of Appeals issued before July 1, 2009, and not designated for publication, shall not be cited, quoted, or referred to in any argument or brief presented to any court. Accordingly, we will not consider any of the unpublished cases, and we urge counsel to consult and comply with our rules in the future.

property description. *Mullins v. Helgren*, 2020 Ark. App. 116, 596 S.W.3d 51. The trial court has addressed Helgren's outstanding claims, and we now have a final order. We affirm as modified.[2]

## I. *Background and Procedural History*

Mullins and Helgren own adjoining acreage off Ragweed Valley Road in Royal, Arkansas. The neighbors got along—Mullins said that she thought of Helgren as a brother—until February or March 2018 when Helgren began construction of a fence. Mullins believed that the discord arose after a neighbor across the street from the parties shot one of Helgren's chickens. Mullins claimed that Helgren subsequently took his frustration out on her. The allegations ranged from Helgren accusing Mullins of running an illegal strip club out of her garage to Mullins asserting that Helgren was holding a stray dog hostage. The parties also threw gas cans, animal cages, and empty beer cans onto each other's property and left unkind notes for each other. When Mullins refused to move her camper, which Helgren perceived as having been abandoned on his property, Helgren literally built his

---

[2]The trial court accepted, and made findings in accordance with, a survey containing a valid property description, which was incorporated and attached to what is now a final order. Although the survey in the record is legible, the photocopy attached to the order is of poor quality and cannot be easily read. As we pointed out in the previous opinion, the property description or boundary must be described such that it can be identified solely by reference to the order or decree. Accordingly, the trial court is instructed to attach to its final order a clear photocopy of the survey with its property description. *See, e.g.*, *Jennings v. Burford*, 60 Ark. App. 27, 958 S.W.2d 12 (1997) (affirming as modified the chancery court's order and allowing the court to amend its decree to include a more specific description of the boundary line).

fence between Mullins's truck and her camper. Mullins now thinks of Helgren not as a brother but as "a lawless rogue . . . on a fence-building bender."

On April 9, 2018, Mullins filed a complaint against Helgren seeking to quiet title to property shown by her 1991 survey. Alternatively, she alleged that she had acquired the property through adverse possession or boundary by acquiescence. She also sought damages for trespass, conversion, and battery as well as a temporary and permanent restraining order. The trial court entered a temporary restraining order (TRO) directing Helgren to cease building a fence, release the dog named "Shuggs," corral his chickens, stop cutting trees, and stay off of Mullins's property. The trial court later found that Helgren had violated the TRO and directed him to remove a fence that he had continued to build. Helgren moved to dismiss Mullins's complaint but, alternatively, filed an answer and counterclaim to quiet title. The boundary dispute was heard in early October 2018.

The following is a summary of the testimony.[3] Mullins testified that she has lived on her property for twenty-six years and that the only property she sought to quiet title to is the property depicted in her 1991 survey.[4] Since 2008, Mullins has been splitting her time between the Ragweed Valley residence and her home in Bryant. Helgren testified that he

---

[3]As we have mentioned in prior unrelated opinions, parties to a land dispute, as well as their lawyers, should limit their use of pronouns and adverbs such as "this," "that," "here," and "there" because of the obvious difficulty for appellate courts to later discern from the record what is being said.

[4]A 2000 redemption deed was introduced showing that Mullins had failed to pay taxes on the 1.85-acre tract from 1996 to 1998.

bought his property in 2007 and has lived there ever since. The land in dispute is described as a gravel area where vehicles have been parked and various items have been placed.

Mullins offered into evidence a photograph with a red line drawn on it by her to indicate where her alleged property line lies. Mullins explained that her property starts at a culvert, which is not depicted in the photograph, to the right of her driveway and extends to the corner of Helgren's shed and then on to a line of trees beyond the gravel area. According to Mullins, when Helgren bought the adjoining property, she walked the property line with him just as her predecessors in title had walked the property line with her. Mullins said that she and Helgren had "lots of conversations" about the boundary line.

Mullins said that a few years before trial, Helgren asked for her permission to build the shed and that he had built it up to the asserted boundary line as discussed. Helgren, on the other hand, said that he and Mullins did not have any agreement about the property line's location and that there was never a discussion that the edge of his shed represented the property line. He claimed that he built the shed where he did because Mullins had said that it would look nice at that location.

Helgren testified that, at Mullins's request, he hired Kevin Foshee in March 2018 to survey his property. Foshee testified that Helgren's property line matches up perfectly with Mullins's 1991 survey. Foshee determined that Mullins's camper overlaps Helgren's property by over twenty feet and that part of her driveway is on Helgren's property. According to Foshee, Mullins's driveway encroaches ten feet to the east and extends thirty feet north. Foshee explained that he picked up a strong magnetic signal underneath Mullins's driveway and that he put a "PK pin" in it representing a corner of Helgren's property.

Mullins insisted that she has always parked vehicles, campers, trailers, boats, jet skis, etc., off her driveway in the gravel area. The camper mentioned previously was acquired by Mullins in 2014 and is inoperable. Many witnesses, including her friends, ex-husband, and sister, confirmed that Mullins used the gravel area for parking. Helgren, however, testified that he also used the gravel area. In Mullins's photograph on which she drew the red line depicting her camper, Helgren pointed out that a boat, a golf cart, and a trailer belonging to him could be seen parked there as well. Kenny Morrison, a neighbor on the other side of Helgren, testified that in the twenty years that he has lived there, he saw numerous things parked in the gravel area, but he said that nothing stayed there and that there were times when nothing was parked there. He said that he had seen a mower, implements, and hay bales belonging to Helgren in the gravel area.

Helgren testified that he had given permission for Mullins to park on his property. This was confirmed by Morrison, who testified that he had heard Mullins ask Helgren for permission to park vehicles in the gravel area when she had friends over and that he had also heard Mullins ask Helgren if she could park her camper there so that she could work on it. Morrison said that he had overheard these conversations within a year and a half before trial.

When asked what maintenance she had done to the gravel area, Mullins said that, aside from planting a cedar tree "back there," she had not planted any shrubs or done any landscaping. She said that she has trimmed the trees to keep them off her camper and dug trenches to keep the rainwater from washing away the gravel. Mullins initially claimed that she mowed the area but then clarified that she had just pulled "stragglers." Helgren testified

that he had picked up limbs, and there was testimony that he had raked the gravel. Morrison testified that the property does not require any maintenance because it is gravel.

Regarding the incident leading to her allegation of battery, Mullins testified that, when she confronted Helgren the following morning about his fence building during the night, he began cursing and screaming at her. She said that he had come at her and shoved her backwards, that the sheriff had been called, and that she had been taken to the hospital by ambulance. Mullins claimed that the rods and pins in her back had not been disturbed by the shoving but that there had been inflammation.

Helgren denied shoving Mullins during the disagreement but said that Mullins had punched him in the face while filming him. Morrison testified that he was present during the dispute—he had been inside Helgren's shed sharpening blades. He said that he heard raised voices; that he heard Helgren tell Mullins to "stop filming [him]"; and that he saw Helgren's hand move and then Helgren stepped back. Morrison insisted that Helgren had not done anything to Mullins that would have required hospitalization. Referring to a photograph of Helgren with a black eye, Morrison said that the photograph accurately depicted the way Helgren looked the day after the incident.

## II. *Trial Court's Orders*

The trial court entered an order pointing out that Mullins had neither provided a survey of the property she sought to prove was acquired by acquiescence nor described the boundary line she claimed using a metes and bounds system. The trial court concluded that it had "no proof from which to adequately describe the property line between the parties other than the original property line." The trial court further found that Mullins failed to

6

prove that she and Helgren had ever acquiesced in moving the property line from its original location and pointed out that Mullins had never erected a fence, planted a shrub, paved, or placed any marker to signify her ownership of Helgren's property. The trial court concluded that the property line should remain as written in the parties' respective deeds and in the 2018 survey and that Helgren was entitled to put a fence along his property line. Finally, the trial court found that Mullins failed to prove that Helgren committed any of the torts alleged. The trial court entered a second order to dispose of Helgren's outstanding claims. Mullins filed timely notices of appeal from both orders; Helgren did not file a cross-appeal.

### III. *Standard of Review*

Boundary-line cases are reviewed de novo. *Durham v. McCone*, 2018 Ark. App. 392, 555 S.W.3d 907. Our court, however, will not reverse findings of fact unless they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made. *Id.* Because the location of a boundary is a disputed question of fact, we will affirm the trial court's finding unless it is clearly against the preponderance of the evidence. *Id.* In reviewing findings of fact, we give due deference to the trial court's superior position to determine the credibility of the witnesses and the weight to be accorded their testimony. *Id.*

### IV. *Discussion*

#### A. Boundary by Acquiescence

Mullins addresses two points separately under this subheading, but she essentially argues that the trial court erred in finding that she failed to prove boundary by acquiescence. Whenever adjoining landowners tacitly accept a fence line or other monument as the visible

7

evidence of their dividing line and thus apparently consent to that line, it becomes the boundary by acquiescence. *Myers v. Yingling*, 372 Ark. 523, 279 S.W.3d 83 (2008). Boundaries are frequently found to exist at locations other than those shown by an accurate survey of the premises in question and may be affected by the concepts of acquiescence and adverse possession. *Charles R. Griffith Farms, Inc. v. Grauman*, 2009 Ark. App. 515, 333 S.W.3d 430. A boundary line by acquiescence is inferred from the landowners' conduct over many years so as to imply the existence of an agreement about the location of the boundary line, and in such circumstances, the adjoining landowners and their grantees are precluded from claiming that the boundary so recognized and acquiesced in is not the true one, although it may not be. *Id.* Moreover, a boundary line by acquiescence may exist without the necessity of a prior dispute. *Id.* Boundary by acquiescence requires three key elements: (1) a tacit agreement between the parties, (2) recognition of the boundary for a long period of time, and (3) a fixed line that is definite and certain. *Follett v. Fitzsimmons*, 103 Ark. App. 82, 286 S.W.3d 746 (2008). Whether a boundary line by acquiescence exists is to be determined by the evidence in each individual case. *Boyette v. Vogelpohl*, 92 Ark. App. 436, 214 S.W.3d 874 (2005).

Mullins's first point is that the trial court erred in requiring her to provide a survey or to use a metes and bounds description of the asserted boundary. Mullins, who had the burden of proof, initially insisted that she wanted only the land shown by her 1991 survey, but the 1991 survey reflected the true property line and aligned with Helgren's 2018 survey. Realizing this midtrial, Mullins conceded that her camper was on Helgren's property and claimed that she was seeking to acquire about twenty to thirty feet of Helgren's property.

8

Mullins said, however, that she was just "guesstimating" and that she would need to go out there and measure it to be sure.[5]

A trial court's order must describe a boundary with sufficient specificity that it can be identified solely by reference to the decree. *See Dohle v. Duffield*, 2011 Ark. App. 135. The trial court accurately pointed out that Mullins could not show by way of either a survey or a metes and bounds description the exact area that she was claiming. The only way Mullins had of describing the area was by reference to moveable objects like her camper, which had been sitting in its location for about four years, or Helgren's shed, which had been built only a few years before trial. Mullins also referred to a line of trees, but the photographs show the trees in a scattered pattern instead of a line. Mullins pointed to the magnetic marker under her driveway; however, the record indicates that, although Mullins claimed that her driveway has been paved for twenty years, she also described it as a gravel driveway in her complaint and said during her testimony that she had poured the asphalt in 2013 or 2014.

In Mullins's second point, she argues that she proved boundary by acquiescence because there was a tacit agreement between her and Helgren. Mullins asserts that the boundary has been recognized for twenty-six or twenty-seven years, collectively, by Helgren and his predecessors. Mullins contends that the boundary line is definite and certain

---

[5]Descriptions that we have found lacking include a decree denoting a line for which no width was given, *Johnson v. Jones*, 64 Ark. App. 20, 977 S.W.2d 903 (1998), and a decree describing the boundary as a meandering fence reflected by a survey, *Jennings*, *supra*. In those cases, we remanded for a better description because the landowners had proved their claims of a prescriptive easement and boundary by acquiescence, respectively. Here, Mullins failed to prove either adverse possession or boundary by acquiescence.

in that it begins at the culvert by the road to the right of her driveway under which is a magnetic marker, then runs to Helgren's shed, and extends to the line of trees where Mullins and her friends have been parking since she moved there. Mullins argues that, although Helgren contests these facts, he is not credible because he is a felon.

The trial court, which determines credibility and the weight of evidence, apparently believed Helgren's testimony that there was no agreement, tacit or otherwise, about the property line. The testimony indicated that both parties used the gravel area and maintained it, to the extent it needed any maintenance. Helgren and Morrison testified that Mullins had within the past year or two sought Helgren's permission to park in the disputed area, which shows her recognition of the area as Helgren's property. Also, Mullins's attempt to establish a fixed boundary by drawing a red line on a photograph falls short of the proof necessary, as do her earlier statements about purported concrete markers. Given the evidence, we cannot say that the trial court clearly erred in finding that Mullins failed to prove boundary by acquiescence.

## B. Trespass, Conversion, and Battery

Mullins argues that the trial court erred in finding that Helgren did not commit any of the various torts alleged. She asserts that Helgren trespassed on her property; that he converted her property by erecting a fence between her truck and her camper; and that he committed battery by shoving her, threatening her, and cursing at her.

Given the trial court's ruling that the disputed property belongs to Helgren, Mullins cannot prevail on her trespass claim because a trespasser is a person who goes *onto the premises of another* without permission and without invitation.

10

Conversion is defined as

> the exercise of dominion over property in violation of the rights of the owner or person entitled to possession. Conversion can only result from conduct intended to affect property. The intent required is not conscious wrongdoing but rather an intent to exercise dominion or control over the goods that is in fact inconsistent with the plaintiff's rights.

*BBAS, Inc. v. Marlin Leasing Corp.*, 104 Ark. App. 63, 66, 289 S.W.3d 153, 155–56 (2008). Mullins has not developed her argument other than to say that Helgren built his fence between her truck and her camper. The trial court could have reasonably concluded that Helgren did not intend to exercise dominion or control over Mullins's inoperable camper given that Helgren considered it "abandoned property" and simply wanted it removed so that he could build a fence.

In order to prove battery, Mullins had to show that Helgren acted with the intent to cause some harmful or offensive contact with her or acted with the intent to create the apprehension of some harmful or offensive contact with her and that this contact resulted in and caused damages. *Haley v. Elkins*, 2019 Ark. App. 247, 576 S.W.3d 111; AMI Civ. 418 (2021). The trial court apparently did not believe Mullins's version of what happened. Helgren denied her allegations, and a disinterested witness who was present during the incident offered testimony in support of Helgren's denial. In any event, Mullins sought damages for the alleged battery but did not introduce a shred of evidence in that regard such as medical bills related to her hospitalization and transport by ambulance or photographs of her injuries. We cannot conclude that the trial court clearly erred in determining that Mullins failed to prove that Helgren committed any of the alleged torts.

Affirmed as modified.

ABRAMSON and KLAPPENBACH, JJ., agree.

*Niswanger Law Firm PLC*, by: *Stephen B. Niswanger*, for appellant.

*Tapp Law Firm, P.A.*, by: *Tylar C.M. Tapp III*, for appellee.